**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

|  |  |
|---|---|
| JADE DAHL, COURTNEY ZACHARIAH, JESSICA MOORE, and CHRISTINA MERREIGHN, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>UNIVERSITY OF KANSAS HOSPITAL AUTHORITY d/b/a UNIVERSITY OF KANSAS HEALTH SYSTEM, LAWRENCE MEMORIAL HOSPITAL d/b/a/ LMH HEALTH, and EPIC SYSTEMS CORPORATION,<br><br>                    Defendants. | Case No. 2:25-cv-02200-HLT-TJJ<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Jade Dahl, Courtney Zachariah, Jessica Moore, and Christina Merreighn (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following against Defendants the University of Kansas Hospital Authority d/b/a The University of Kansas Health System ("KU Health"), Lawrence Memorial Hospital d/b/a LMH Health ("LMH"), and Epic Systems Corporation ("Epic") (collectively, "Defendants"):

## INTRODUCTION

1. This case arises from one of the most devastating kinds of privacy violations imaginable. At least 425 patients of Plastic Surgery Specialists of Lawrence, an affiliate of LMH, suffered grave invasions of their privacy (the "Privacy Invasions") when their most intimate health information and medical files were accessed by a licensed athletic trainer employed by KU Health (the "Clinician"), who had no affiliation with LMH or its plastic surgery clinic and who never provided treatment to Plaintiffs.

2. Over the course of more than two years, the Clinician used his KU Health-issued credentials to perpetrate the Privacy Invasions by accessing patient files through an Epic electronic health records ("EHR") portal that permitted patient data sharing between unrelated health systems. These patient files contained clinical photographs, body measurements, and other highly sensitive personally identifiable information ("PII") and protected health information ("PHI") of at least 425 (likely female) patients who had undergone various surgeries and procedures at Plastic Surgery Specialists of Lawrence.

3. When KU Health eventually discovered—or was alerted to—the Clinician's misconduct, it quietly terminated his employment. KU Health failed to notify law enforcement and sought to downplay the incident by issuing a non-descript data breach notification to affected patients that failed to disclose the true nature or extent of the Privacy Invasions.

4.    LMH, for its part, provided no written notice whatsoever to Plaintiffs Dahl, Zachariah, and Moore regarding the Privacy Invasions. The notice it provided to Plaintiff Merreighn likewise failed to disclose the true nature or extent of the Privacy Invasions.

5.    KU Health utilizes an Epic EHR system. Upon information and belief, Epic designed, developed, created, and implemented this system for KU Health and provides software support services to KU Health related to storing, accessing, viewing, obtaining, sharing, and transferring the PII and PHI.

6.    Plaintiffs bring this action on behalf of themselves and all other individuals whose sensitive medical information was improperly accessed by the Clinician pursuant to Federal Rules of Civil Procedure 23(c)(4) and (b)(3).

7.    As a KU Health employee, the Clinician intentionally violated the rights and privacy of Plaintiffs and the Class members, and KU Health negligently supervised, trained, and retained Clinician during his tenure. KU Health knew or should have known that Clinician was repeatedly accessing the medical records of LMH plastic surgery patients without any legitimate treatment relationship yet failed to take corrective action. This lack of oversight enabled his unlawful conduct to continue unchecked for years.

8.    LMH is also liable for failing to protect the highly sensitive PII and PHI of its patients, including allowing access to patient records by unaffiliated healthcare providers without adequate training and without verification of their relationship to the patient or basis for access.

9.    Epic is liable for its failure to implement and maintain adequate access controls, audit mechanisms, and real-time alerts within its EHR platform to detect and prevent unauthorized access to patient records by individuals with no treatment relationship to the patient.

## **<u>PARTIES</u>**

10.    Plaintiff Jade Dahl is a citizen of Kansas residing in Riley County, Kansas.

2

11.    Plaintiff Courtney Zachariah is a citizen of Missouri residing in Platte County, Missouri.

12.    Plaintiff Jessica Moore is a citizen of Kansas residing in Shawnee County, Kansas.

13.    Plaintiff Christina Merreighn is a citizen of Kansas residing in Douglas County, Kansas.

14.    Defendant the University of Kansas Hospital Authority d/b/a the University of Kansas Health System is a health care provider established under Kansas statute and headquartered in Westwood, Kansas. Defendant KU Health is the former employer of the Clinician.

15.    Defendant Lawrence Memorial Hospital d/b/a LMH Health is a health care provider headquartered in Lawrence, Kansas.

16.    Defendant Epic Systems Corporation is a Wisconsin corporation, with its principal place of business in Verona, Wisconsin. Epic develops and sells health informatics software, mainly electronic medical record platforms, to a variety of health care provider consumers throughout the world, including in the United States, and specifically in the state of Kansas.

## JURISDICTION AND VENUE

17.    This action arises under the Fourteenth Amendment to the United States Constitution, brought pursuant to 42 U.S.C. § 1983; the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; and the Stored Communications Act ("SCA"), 18 U.S.C. § 2701. The Court therefore has subject-matter jurisdiction over Plaintiffs' § 1983, CFAA, and SCA claims pursuant to 28 U.S.C. § 1331.

18.    Plaintiffs' and the Class members' state-law claims and federal claims arise from a common nucleus of operative fact such that they form part of the same case or controversy under Article III of the United States Constitution. The Court therefore has supplemental jurisdiction

over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) and *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966).

19.     The Court also has subject-matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and at least one Class member is a citizen of a state different from at least one Defendant.

20.     This Court has general personal jurisdiction over KU Health because it is incorporated in Kansas and maintains its principal place of business within the state. KU Health also engages in substantial, continuous, and systematic business operations in Kansas, including activities directly related to the claims asserted by Plaintiffs and the Class. KU Health has purposefully directed its conduct toward Kansas and has sufficient minimum contacts with the state to support the exercise of specific personal jurisdiction in this matter.

21.     The Court has general personal jurisdiction over LMH because LMH is incorporated in Kansas and maintains its principal place of business within the state. LMH also conducts substantial business in Kansas related to Plaintiffs and Class members and has thereby purposefully established minimum contacts with Kansas sufficient to authorize this Court's exercise of specific personal jurisdiction over LMH in this case.

22.     The Court has specific personal jurisdiction over Epic because Epic conducts substantial business in Kansas related to Plaintiffs and Class members and has thereby purposefully established minimum contacts with Kansas sufficient to authorize this Court's exercise of jurisdiction over Epic in this case.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because all Defendants are subject to this Court's personal jurisdiction with respect to this action and are

therefore residents of Kansas, where this District is located, for venue purposes; a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District; and a substantial part of the property that is the subject of this action is situated in this District.

## **FACTUAL ALLEGATIONS**

### *Plaintiffs' PII and PHI*

24.    Plaintiff Dahl has been a patient of Plastic Surgery Specialists of Lawrence at LMH and has also been a patient of KU Health.

25.    As a patient of LMH, Plaintiff Dahl underwent several procedures between November 2021 and May 2023.

26.    As part of the procedures Plaintiff Dahl underwent as a patient at LMH, her plastic surgeon took measurements of her body.

27.    Also as part of these procedures, Plaintiff Dahl's surgeon at LMH took pre-operative and post-operative photographs of her entire body from multiple angles, including photos of her chest and genital area. Several of these photographs include Plaintiff Dahl's face, both with and without a surgical mask.

28.    These measurements and photographs are important parts of Plaintiff Dahl's medical file and her PII and PHI. They are also highly sensitive, personal, and confidential.

29.    Plaintiff Dahl's sensitive PII and PHI also include her full name, date of birth, physical address, phone number, Social Security number, and health insurance information.

30.    Plaintiff Dahl never sought or received treatment by KU Health for anything related to the procedures she underwent at LMH.

31.    Plaintiff Dahl does not know and has never received treatment from Clinician.

32.    Plaintiff Zachariah has been a patient of Plastic Surgery Specialists of Lawrence at LMH and has also been a patient of KU Health.

33.     As a patient of LMH, Plaintiff Zachariah underwent a procedure that required multiple visits between November 2021 and early 2022.

34.     As part of this procedure, Plaintiff Zachariah's surgeon at LMH took pre-operative and post-operative photographs of her body from multiple angles, including photos of her chest. Several of these photographs included Plaintiff Zachariah's face.

35.     These measurements and photos are important parts of Plaintiff Zachariah's medical file and her PII and PHI. They are also highly sensitive, personal, and confidential.

36.     Plaintiff Zachariah's sensitive PII and PHI also include her full name, date of birth, physical address, phone number, Social Security number, and health insurance information.

37.     Plaintiff Zachariah never sought or received treatment by KU Health for anything related to the procedures she underwent at LMH.

38.     Plaintiff Zachariah does not know and has never received treatment from Clinician.

39.     Plaintiff Moore has been a patient of Plastic Surgery Specialists of Lawrence at LMH and has also been a patient of KU Health.

40.     As a patient of LMH, Plaintiff Moore underwent several procedures that required multiple visits between June 2017 and June 2018.

41.     As part of these procedures, Plaintiff Moore's surgeon at LMH took pre-operative and post-operative photographs of her body from multiple angles, including photos of her chest. Several of these photographs included Plaintiff Moore's face.

42.     These measurements and photos are important parts of Plaintiff Moore's medical file and her PII and PHI. They are also highly sensitive, personal, and confidential.

43.     Plaintiff Moore's sensitive PII and PHI also include her full name, date of birth, physical address, phone number, Social Security number, and health insurance information.

44.     Plaintiff Moore never sought or received treatment by KU Health for anything related to the procedures she underwent at LMH.

45.     Plaintiff Moore does not know and has never received treatment from Clinician.

46.     Plaintiff Merreighn has been a patient of Plastic Surgery Specialists of Lawrence at LMH and has also been a patient of KU Health.

47.     As a patient of LMH, Plaintiff Merreighn underwent multiple procedures that required multiple visits from June 2020 through 2021.

48.     As part of these procedures, Plaintiff Merreighn's surgeon at LMH took pre-operative and post-operative photographs of her body from multiple angles, including photos of her chest.

49.     These measurements and photos are important parts of Plaintiff Merreighn's medical file and her PII and PHI. They are also highly sensitive, personal, and confidential.

50.     Plaintiff Merreighn's sensitive PII and PHI also include her full name, date of birth, date(s) of service, treating physician, and service location.

51.     Plaintiff Merreighn never sought or received treatment by KU Health for anything related to the procedures she underwent at LMH.

52.     Plaintiff Merreighn does not know and has never received treatment from Clinician.

### *KU Health's Privacy Practices*

53.     Defendant KU Health is a health care provider holding itself out as "a world-class academic medical center and destination for complex care and diagnosis" with the goal of "ensur[ing] that you have the best possible healthcare experience by receiving quality care and outstanding service."[1]

---

[1] https://www.kansashealthsystem.com/about-us (last visited June 20, 2025).

54.      KU Health markets itself as "a not-for-profit, independent hospital authority" that "receives no state or local funding."[2]

55.      As a healthcare provider, KU Health routinely requests, receives, stores, and transmits patient PII and PHI, including that of Plaintiffs and Class members.

56.      Recognizing its duty to preserve and protect its patients' informational privacy, KU Health provides a "Notice of Privacy Practices" on its website, where KU Health represents that it "is committed to protecting your medical information."[3]

57.      In its Notice of Privacy Practices, KU Health acknowledges that "[w]e are required by law to maintain the privacy and security of your protected health information" and that "[w]e must follow the duties and privacy practices described in this Notice."[4]

58.      KU Health represents that it "participates in the electronic exchange of health information, which is also called [a] health information exchange (HIE)," which "allows a provider to make a single request through a health information organization (HIO) to obtain records for a specific patient from other HIE participants for purposes of treatment, payment, healthcare operations, and/or other lawful purposes."[5]

59.      KU Health acknowledges that "HIOs are required to use appropriate safeguards to prevent unauthorized uses and disclosures."[6]

60.      KU Health also recognizes its duty to adequately supervise and train its employees to protect its patients' informational privacy against cybersecurity threats by maintaining a

---

[2] https://www.kansashealthsystem.com/giving/contact-us/faq (last visited June 20, 2025).
[3] https://www.kansashealthsystem.com/patient-visitor/policies-procedures/patient-rights/privacy (last visited June 20, 2025).
[4] https://www.kansashealthsystem.com/-/media/Project/Website/PDFs-for-Download/privacy/Joint-NPP-ENGLISH-030124.pdf?la=en&hash=268D27B9A24F983C5021EC7B20A5A3054F3A5FB0 (last visited June 20, 2025).
[5] *Id.*
[6] *Id.*

"Cybersecurity Vulnerability Management Policy," which "is applicable to all University of Kansas Health System (health system) employees, contractors, and any other parties that access, alter, create, dispose of, receive, store, or transmit any health system data or technology assets."[7]

61.     KU Health requires that "[c]ompliance with this policy is mandatory"; acknowledges that "[v]iolation of this policy may cause monetary loss, reputational damage, and impact patient care"; and warns that "individuals may be subject to discipline, up to and including the termination of their employment."[8]

62.     By obtaining, collecting, and storing the PII and PHI of Plaintiffs and Class members and by participating in data access portals such as Health Information Exchanges, KU Health assumed legal and equitable duties, including the duty to protect the privacy and security of its patients' PII and PHI and to adequately supervise and train its employees in furtherance of these duties.

### *LMH's Privacy Practices*

63.     Defendant LMH is a health care provider holding itself out as "a community-owned, not-for-profit hospital that serves the health care needs of the community" that "receives no tax support from the city of Lawrence or Douglas County."[9]

64.     As a health care provider, LMH routinely requests, receives, stores, and transmits the PII and PHI of its patients, including that of Plaintiffs and the Class members.

65.     Recognizing its duty to preserve and protect its patients' informational privacy, LMH provides a "Notice of Privacy Practices" on its website.[10]

---

[7] https://kumed.policystat.com/policy/15697035/latest/?showchanges=true (last visited June 20, 2025).
[8] *Id.*
[9] https://www.lmh.org/about-us/ (last visited June 20, 2025).
[10] https://www.lmh.org/patients-visitors/lmh-health-privacy/ (last visited June 20, 2025).

66.     In its Notice of Privacy Practices, under a section titled "Our Pledge Regarding Medical Information," LMH promises that "[w]e understand that medical information about you and your health is personal" and that "[w]e are committed to protecting medical information about you."[11]

67.     LMH acknowledges that "[w]e participate in several [Health Information Exchanges], including the Kansas Health Information Network . . . and CommonWell."[12]

68.     LMH defines Health Information Exchanges as "networks of electronic health information contributed by various providers," which allow healthcare providers to "see[] records of past care received at other locations in an HIE."[13]

69.     LMH also acknowledges that "[w]e are required by law to . . . [m]ake sure that medical information that identifies you is kept private; [m]ake available to you, this notice of our legal duties and privacy practices with respect to medical information about you; and [f]ollow the terms of the notice that is currently in effect."[14]

70.     By obtaining, collecting, and storing the PII and PHI of Plaintiffs and Class members and by participating in data access portals such as Health Information Exchanges, LMH assumed legal and equitable duties, including the duty to protect the privacy and security of its patients' PII and PHI.

### *Epic's Relationship with KU Health*

71.     Epic develops and sells health informatics software—primarily electronic medical record platforms—to a variety of health care provider clients throughout the world, including in

---

[11] https://www.lmh.org/app/files/public/e54a9a3b-6cff-43cb-8f1e-5230943f3f3a/npp20190610-en.pdf
(last visited June 20, 2025).
[12] *Id.*
[13] *Id.*
[14] *Id.*

the United States, and specifically in the State of Kansas where it conducts business including with KU Health.

72.    Epic enjoys the largest market share in the EHR solutions space.

73.    Epic designed, developed, sold, and implemented a customized EHR system known as "Epic O2" for KU Health. Implementation of the Epic O2 platform at KU Health began in or around 2015.

74.    Epic O2 serves as the primary EHR system for The University of Kansas Health System. Access to Epic O2 is governed by user roles and permissions and is limited to credentialed KU Health personnel with login credentials issued by the organization.

75.    Healthcare systems such as KU Health may participate in one or more Health Information Exchanges or Qualified Health Information Networks, which are designed to enable the secure exchange of EHR data among otherwise unaffiliated providers. These networks operate pursuant to agreed-upon rules and protocols for accessing, retrieving, and sharing electronic health records.

76.    KU Health participates in Epic's proprietary health information exchange platform known as Care Everywhere, which facilitates data sharing between Epic-based EHR systems and other EHR systems, including non-Epic platforms such as that used by LMH.[15]

77.    For example, both KU Health and LMH are participants in the Kansas Health Information Network, a regional Health Information Exchange or Qualified Health Information Network that enables the sharing of patient data across unaffiliated healthcare providers within Kansas.

---

[15] https://www.epic.com/careeverywhere/?searchText=kansas (last visited June 20, 2025).

78.    Health Information Exchanges and Qualified Health Information Networks typically enter into formal agreements with participating healthcare providers, such as KU Health and LMH. These agreements establish defined parameters governing the access, use, and sharing of EHR data. The terms of such agreements are generally designed to conform to international health informatics standards, including the HL7 Electronic Health Record-System Functional Model, Release 2.1, adopted by the International Standards Organization as ISO 10781:2023 (1st Ed. 2023).

79.    Interoperability of EHR systems across different platforms is governed by widely recognized technical standards, including Clinical Document Architecture for determining what information is shared, and Fast Healthcare Interoperability Resources and Health Level Seven International for determining how that information is exchanged. These standards are specifically designed to support secure data interoperability in compliance with federal regulations such as the Health Insurance Portability and Accountability Act ("HIPAA") and the Health Information Technology for Economic and Clinical Health Act ("HITECH"), and are intended to ensure the privacy of patients' PII and PHI.

80.    As the designer, manufacturer, distributor, and licensor of health informatics software, Epic owed Plaintiffs and the Class a duty to exercise reasonable care in the design, development, and maintenance of its EHR systems. This duty included an obligation to ensure that its products complied with applicable legal and technical standards to prevent unauthorized access and protect the privacy and security of patients whose data is processed through its systems.

### The Privacy Invasions

81.    Starting in at least February 2021, the Clinician began unlawfully accessing highly sensitive PII and PHI belonging to Plaintiffs and members of the Class. Upon information and belief, the Clinician specifically targeted female patients who had undergone breast augmentation

and related surgical procedures at Plastic Surgery Specialists of Lawrence, whose medical records included detailed body measurements, clinical photographs, and other intimate and sensitive health information.

82.     For a period of at least two years, the Clinician—despite having no treatment relationship or legitimate purpose—was able to access the PII and PHI of Plaintiffs and members of the Class through the Epic user interface, apparently without detection by KU Health or LMH and without alert or flagging by Epic or its system.

83.     Clinician was able to access Plaintiffs' and Class members' PII and PHI by virtue of his employment by KU Health.

84.     Plaintiffs never sought or received medical treatment from KU Health regarding the procedures performed at LMH, nor did they have any interaction or treatment relationship with the Clinician.

85.     KU Health did not detect the Privacy Invasions until February 22, 2023.

86.     On or about April 20, 2023—nearly two months after KU Health claims to have discovered the Privacy Invasions—KU Health sent Plaintiffs a letter ("KU Letter") stating that their PII and PHI had been compromised in a data breach caused by a KU Health employee.

87.     In its April 2023 Letter, KU Health stated: "On February 22, 2023, we became aware that one of our employees may have accessed your personal information outside of their job duties," and further explained: "We immediately undertook an investigation, confirmed that between February 1, 2021, and February 22, 2023, the employee did access your information, and we were not able to conclusively identify a job-related function for such employee's access."

88.     Upon information and belief, the KU Health employee referred to in the April 2023 Letter is the Clinician, though KU Health's letter does not identify him, and KU Health has otherwise refused to provide Clinician's identity to Plaintiffs or the Class members.

89.    KU Health further stated in its April 2023 Letter that "[t]he information that the employee potentially accessed was that which is maintained in our electronic health record system, which includes your name, date of birth, address, phone number, insurance and billing information, social security number, and clinical information."

90.    KU Health's letter states that "we terminated the employee involved in this incident."

91.    While KU Health claimed that "[t]he employee's access to your information was not continuous or ongoing," this assertion contradicts KU Health's own admission that the access occurred over a two-year period and is inconsistent with other known facts and evidence.

92.    The KU Health Letter raises more questions than it answers. It fails to identify the Clinician; it omits the total number of affected patients; it does not clarify whether the accessed PII and PHI originated solely from KU Health or also from other healthcare providers; it provides no indication as to whether the data was exfiltrated; it does not specify what is included in the referenced "clinical information" that was compromised during the Privacy Invasions; and it does not warn the victims their safety may be at risk.

93.    On February 21, 2024, almost a year after it issued the April 2023 Letter, KU Health submitted a report to the Secretary of the U.S. Department of Health and Human Services regarding the Privacy Invasions ("HHS Report").

94.    KU Health's HHS Report includes information that KU Health omitted from its April 2023 Letter to the victims of the Privacy Invasions. According to KU Health's HHS Report, the role of the Clinician who perpetrated the Privacy Invasions "was to coordinate care for several providers requiring not only access to patients related to the employee's primary department but also in departments in which referrals would be sent for continuing care."

95.     The HHS Report also states that "[a]n investigation for a two year period determined the employee had accessed patient's medical records in which it could not be conclusively determined the access was job related."

96.     The HHS Report also states that there are at least 425 individuals affected.

97.     In or around April 2023, LMH also sent a notice letter to victims of the Privacy Violations stating that their PII and PHI had been compromised in a data breach ("LMH Letter").

98.     The LMH Letter stated: "We are writing to inform you of an incident that involved an individual accessing your personal information." LMH explained that "[t]o provide services to our patients, LMH Health may enable access to its electronic health record ("EHR") system to individuals who are employed by other health care providers in our community ("Non-Employed Users"). These Non-Employed Users perform functions on behalf of other health care providers that involve coordination of care for patients that receive services from LMH Health and the other health care providers."

99.     LMH disclosed that, "[o]n February 21, 2023, LMH Health discovered that a Non-Employed User had used their access to LMH Health's EHR in a manner not permitted by LMH Health policy."

100.    According to the Letter, LMH "quickly terminated the Non-Employed User's access and initiated an investigation." The investigation concluded that victims' "information was likely viewed by this Non-Employed User."

101.    On information and belief, the "Non-Employed User" referenced in the LMH Letter is the Clinician formerly employed by KU Health. The LMH Letter did not identify the Clinician or his employer.

102.     LMH acknowledged that "[t]he information that may have been viewed includes name, date of birth, allergies, date(s) of service, treating physician, service location, clinical documentation, diagnostic reports, medical conditions, and/or medical images."

103.     The LMH Letter further states that "[w]e are reviewing our processes for granting employees and Non-Employed Users access to our patient information and taking further measures to strengthen our protection of patient information and ensure appropriate use. We are also redoubling our efforts to monitor access to our systems and providing additional education to our employees and Non-Employed Users regarding appropriate use of your information."

104.     Like the KU Health letter, the LMH Letter fails to identify the Clinician or his employer at the time of the unauthorized access. It does not disclose the duration of the improper access, the number of patients affected, or whether the accessed PII and PHI originated exclusively from LMH or also from other providers. It offers no information as to whether the data was downloaded or screen captured, fails to specify what is included in the referenced "clinical documentation," and it does not warn the victims their safety may be at risk.

### *Plaintiff Allegations*

105.     Upon receiving the KU Health Letter, Plaintiff Dahl was surprised and confused because she is not a regular patient of KU Health, though she has received treatment at KU Health facilities for unrelated matters.

106.     Out of an abundance of caution, Plaintiff Dahl called the office of her plastic surgeon at LMH to make sure the Privacy Invasions did not involve any medical files associated with her procedures at LMH.

107.     To Plaintiff Dahl's shock and dismay, her surgeon informed her that Clinician had keystroked her name, letter-by-letter, multiple times during the period of the Privacy Invasions and that Clinician was able to access her medical records at LMH.

108.    Plaintiff Dahl was confused because she had never sought treatment from KU Health related to her procedures at LMH, and it did not make sense why a KU Health employee could access her medical records at an unaffiliated hospital when there was no treatment by KU Health involved.

109.    Plaintiff Dahl asked her LMH surgeon whether Clinician had accessed or looked at her clinical photographs and body measurements. Plaintiff Dahl's surgeon would not answer with a definitive "yes" or "no," but the surgeon confirmed that her clinical files contained the photographs and body measurements and that LMH's electronic records system was "sistered in" to KU Health's system.

110.    Plaintiff Dahl also learned she is not the only victim: LMH informed Plaintiff Dahl that its surgeons were contacting other victims to inform them of the Privacy Invasions.

111.    Plaintiff Dahl contacted KU Health to arrange an in-person meeting regarding the Privacy Invasions. On or about May 5, 2023, Plaintiff Dahl met in-person with KU Health personnel at KU Health's headquarters in Westwood, Kansas.

112.    KU Health showed Plaintiff Dahl a packet of information, which KU Health told Plaintiff Dahl was a sample of what was accessed in the Privacy Invasions. What Plaintiff Dahl saw was horrifying. The packet showed what the KU Health employee (they refused to identify Clinician by name) typed in by keystroke. The packet showed that Clinician had taken at least one screenshot of Plaintiff Dahl's information—her driver's license—after Clinician had viewed it twice.

113.    Among other things, the sample showed that Clinician had searched specifically for Plaintiff Dahl and had accessed her medical file, which included Plaintiff Dahl's name, address, date of birth, driver's license, clinical notes, and other personal information. The records Clinician viewed went back to at least 2010.

17

114.    A KU Health officer acknowledged that the person who perpetrated the Privacy Invasions was a KU Health employee but refused to identify him by name. KU Health stated that it had investigated Clinician's access of LMH patients' PII and PHI but that the investigation was inconclusive as to whether Clinician had a "working need" to be accessing this information.

115.    KU Health further revealed that the Clinician was specifically targeting LMH patients in his searches and that there is a "continuation of care" portal between KU Health and LMH.

116.    When Plaintiff Dahl asked for a copy of the packet KU Health had shown her, KU Health refused.

117.    Since Plaintiff Dahl's in-person meeting with KU Health personnel in May 2023, neither KU Health nor LMH has provided Plaintiff Dahl with any more information about the Privacy Invasions or offered any additional support.

118.    The KU Health Letter sent to Plaintiff Dahl was purposely vague and omitted numerous key details despite her safety being at risk. And LMH did not provide Plaintiff Dahl with any written notification of the Privacy Invasions.

119.    Plaintiff Zachariah also received the KU Health Letter.

120.    Upon receiving the letter, Plaintiff Zachariah was surprised and confused because she is not a regular patient of KU Health, though she has received treatment at KU Health facilities for unrelated matters.

121.    Out of an abundance of caution, Plaintiff Zachariah contacted LMH by phone to make sure the Privacy Invasions did not involve any medical files associated with her procedure at LMH.

122.    While LMH did not deny that Plaintiff Zachariah's PII and PHI were involved in the Privacy Invasions, LMH would not share any details regarding the Privacy Invasions with Plaintiff Zachariah.

123.    Plaintiff Zachariah also contacted KU Health to inquire about the Privacy Invasions. KU Health would not provide Plaintiff Zachariah with any details beyond those general statements contained in the April 2023 Letter.

124.    Neither KU Health nor LMH has provided Plaintiff Zachariah with any more information about the Privacy Invasions or offered any additional support.

125.    The KU Health letter sent to Plaintiff Zachariah was purposely vague and omitted numerous key details despite her safety being at risk. And LMH did not provide Plaintiff Zachariah with any written notification of the Privacy Invasions.

126.    Plaintiff Jessica Moore also received KU Health's Letter in April 2023.

127.    Upon receiving the letter, Plaintiff Moore was surprised and confused because, though she has received treatment at KU Health facilities for unrelated matters, she has never sought or received treatment from KU Health related to her procedures at LMH.

128.    Out of an abundance of caution, Plaintiff Moore contacted a KU Health privacy officer to seek more information about the Privacy Invasions.

129.    The KU Health privacy officer would not identify the Clinician or share any details about the Privacy Invasions with Plaintiff Moore.

130.    Neither KU Health nor LMH has provided Plaintiff Moore with any more information about the Privacy Invasions or offered any additional support.

131.    The KU Health Letter sent to Plaintiff Moore was purposely vague and omitted numerous key details despite her safety being at risk. And LMH did not provide Plaintiff Moore with any written notification of the Privacy Invasions.

19

132.    Plaintiff Christina Merreighn received LMH's Letter in April 2023.

133.    Upon receiving the letter, Plaintiff Merreighn was surprised and confused due to the vague phrasing of the LMH Letter.

134.    Out of an abundance of caution, Plaintiff Merreighn attempted to contact LMH

135.    Neither KU Health nor LMH has provided Plaintiff Merreighn with any more information about the Privacy Invasions or offered any additional support.

136.    LMH's Letter sent to Plaintiff Merreighn was purposely vague and omitted numerous key details despite her safety being at risk. And KU Health did not provide Plaintiff Merreighn with any written notification of the Privacy Invasions despite the fact that it was a KU Health employee—the Clinician—who had accessed Plaintiff Merreighn's PII and PHI.

137.    The inconsistent communications from KU Health and LMH regarding the Privacy Invasions have compounded the harm suffered by Plaintiffs and other victims. While both institutions were aware that a KU Health employee had improperly accessed sensitive patient information through shared electronic health records, neither provided the victims with clear, complete, or coordinated disclosures. This lack of transparency has not only caused confusion and distress among the victims but also obstructed their ability to understand the nature, scope, and potential consequences of the Privacy Invasions.

138.    On information and belief, Clinician has never been investigated, arrested, or charged in connection with his conduct. No disciplinary action has been reported by the Kansas Board of Healing Arts, and no law enforcement agency appears to have taken action against him to date.

***Clinician's Conduct and the Privacy Invasions Were Foreseeable and Preventable***

139.    As healthcare providers that collect, store, and share large volumes of highly sensitive personal data—and as participants in data-sharing platforms such as Health Information

Exchanges—KU Health and LMH had a duty to implement robust safeguards to prevent, detect, report, and terminate unauthorized access to PII and PHI. These safeguards should have been in place well before the Clinician was able to unlawfully access the records of more than 400 non-treating individuals over a period exceeding two years.

140.    By choosing to create or participate in Health Information Exchanges that enable cross-organization access to patient records, KU Health and LMH assumed responsibility for maintaining strict access controls, including ensuring that only *treating* healthcare providers and their authorized staff are granted access to patients' sensitive PII and PHI.

141.    KU Health and LMH should have conducted regular audits and to actively monitor audit logs for improper or anomalous access to patient records, including identifying access by non-treating personnel, repeated access to multiple patient files without clinical justification, or access during irregular hours. Their failure to do so permitted the Clinician's unauthorized access to continue undetected for over two years.

142.    KU Health also knew that its employees, like Clinician, routinely accessed the PII and PHI of its patients and those patients of other healthcare providers participating in the same Health Information Exchanges in which KU Health and LMH participate.

143.    KU Health employed the Clinician in a role that, by its nature, provided access to electronic health records, including those accessible through Health Information Exchanges. It was therefore foreseeable to KU Health that, without proper oversight, the Clinician could access the PII and PHI of Plaintiffs and members of the Class, even though he had no treatment relationship with them.

144.    KU Health had a duty to monitor and audit its employees' access to PII and PHI available through the Health Information Exchanges in which it participated. This included ensuring that access was limited to patients under an employee's direct care or for whom a

legitimate, authorized purpose existed. KU Health failed to implement and enforce adequate monitoring protocols, thereby allowing the Clinician to engage in unauthorized access over an extended period of time.

145.    The unauthorized viewing of patient medical records—commonly referred to as "EHR snooping"—is a well-documented and serious privacy threat within the healthcare industry. EHR snooping violates HIPAA,[16] exposes individuals to risks such as medical identity theft or criminal activity, and can result in legal and financial consequences for healthcare organizations.

146.    Examples of recent instances of snooping by healthcare employees include:[17]

a.    Montefiore Medical Center (2020): Unauthorized access to around 4,000 patient records led to the termination of an employee.[18]

b.    Huntington Hospital (2021): An employee was terminated for inappropriately accessing patient records, affecting approximately 13,000 patients. Although the incident was discovered in 2021, it occurred in 2018 and 2019.[19]

c.    Asanta (2023): A physician was terminated for unauthorized access to patient records over nine years.[20]

d.    DCH Health System (2023): A routine audit uncovered unauthorized access to patient records, prompting an investigation and notification of affected patients.

---

[16] https://www.foxgrp.com/hipaa-compliance/employee-snooping-a-too-common-hipaa-violation/#Defending (last visited June 20, 2025).

[17] https://www.paubox.com/blog/ehr-snooping-tackling-unauthorized-access-and-strengthening-trust (last visited June 20, 2025).

[18] https://www.healthcareitnews.com/news/ehr-snooping-montefiore-leads-security-breach (last visited June 20, 2025).

[19] https://www.healthcareitnews.com/news/ehr-snooping-leads-criminal-hipaa-violation-charges-new-york (last visited June 20, 2025).

[20] https://www.asante.org/app/files/public/daa5d0b7-87bf-4944-9d38-ea2bcd972cc5/Hoffman_Breach_Notice.pdf (last visited June 20, 2025).

147.    At the time of the Privacy Invasions, KU Health knew that its patients' PII and PHI had previously been subject to improper access and disclosure, including by KU Health's own employees. For example, between February 15, 2021, and February 21, 2024, KU Health reported at least 31 incidents of "Unauthorized Access/Disclosure," "Improper Disposal," "Loss," "Theft" of patient PHI to HHS. The Privacy Invasions were included as one of these reported incidents.

148.    Of these 31 incidents KU Health reported to HHS, at least 14 involved unauthorized access to or disclosure of patient PHI by KU Health's *own* employees. In one incident, a former employee improperly sent and retained emails containing the PHI of 57 KU Health patients. According to KU Health, "Requests for the former employee to permanently delete the emails and sign an attestation did not occur."

149.    In response to the Privacy Invasions, KU Health stated in its April 2023 Letter that it "immediately undertook an investigation"; that it "terminated the employee involved in this incident"; and that it was "taking all appropriate steps with staff, including re-education related to appropriate access to patient information" and "reviewing our policies and procedures to determine whether updates are necessary."

150.    But these measures were reactive and came far too late. KU Health should have implemented appropriate employee oversight, access controls, and policy reviews long before the Clinician was able to access the PII and PHI of approximately 425 patients—individuals he did not treat and with whom he had no clinical relationship—over a period spanning multiple years.

151.    As to LMH, Plaintiffs Dahl, Zachariah, and Moore did not receive any written notification about the security breach. Even if LMH were to claim that the Clinician did not access their full records, it is clear that he was able to identify and target them as LMH patients. This confirms that LMH shared sensitive patient information with KU Health in a manner that permitted access by KU Health employees who had no treatment relationship with the patients and no

legitimate purpose for accessing their records or knowing their identities. As a treating provider, LMH had an affirmative duty to notify these patients of what it knew about the unauthorized access, including that their identities and status as LMH patients had been disclosed to a non-treating individual at another healthcare institution, who then used that information to access (or at least attempt to access) their highly sensitive medical information and records.

152.    The LMH Letter reflects many of the same deficiencies as the KU Health Letter. In response to the Privacy Invasions, LMH stated that it had "quickly terminated the Non-Employed User's access," "initiated an investigation," and was "reviewing [its] processes for granting employees and Non-Employed Users access to [its] patient information and taking further measures to strengthen [its] protection of patient information and ensure appropriate use." LMH further asserted that it was "redoubling [its] efforts to monitor access to [its] systems and providing additional education to [its] employees and Non-Employed Users regarding appropriate use of [patient] information."

153.    But these measures were reactive and came far too late. LMH should have implemented appropriate oversight of its Non-Employed Users, access controls, and policy reviews long before the Clinician was able to access the PII and PHI of LMH's patients—individuals he did not treat and with whom he had no clinical relationship—over a period spanning multiple years.

154.    Like KU Health, LMH had a duty to adequately monitor and audit access to its patients' PII and PHI, particularly through the Health Information Exchanges in which it participated. This included ensuring that only authorized individuals with a legitimate treatment relationship accessed patient records.

155.    At the time of the Privacy Invasions, KU Health and LMH were keenly aware of their duties to protect the privacy and security of their patients' PII and PHI, as exemplified by

their Notices of Privacy Practices and the terms and conditions of their agreements regarding storage, maintenance, and exchange of EHR, to which Plaintiffs do not have access.

156.    At all relevant times, KU Health and LMH knew or reasonably should have known of the critical importance of safeguarding patients' PII and PHI, as well as the foreseeable consequences of failing to do so. These consequences include the substantial emotional, financial, and legal burdens that patients suffer when their sensitive medical information is improperly accessed or disclosed—harms that are well-documented and widely acknowledged across the healthcare industry.

157.    Despite the widespread and well-publicized risks of EHR snooping, improper employee access to patient records, and data breaches involving PII and PHI—and despite their roles as custodians of thousands of patient records and participants in interoperable Health Information Exchanges—KU Health and LMH failed to exercise reasonable care in protecting the privacy and security of the PII and PHI entrusted to them. Had either entity implemented basic, industry-standard safeguards—such as proper access controls, routine audit log reviews, or real-time access alerts—the Clinician would not have been able to access the confidential medical records for more than 400 individuals over the course of more than two years.

### Defendants KU Health and LMH Failed to Comply with State and Federal Law and Regulatory Guidance

158.    The Kansas Data Breach Requirements Act ("KDBRA"), K.S.A. § 50-7a02, requires KU Health and LMH to notify victims of data breaches "in the most expedient time possible and without unreasonable delay."

159.    KU Health violated this provision by failing to detect the Privacy Invasions here for more than two years and then waiting two months after discovery to notify victims of the Privacy Invasions in writing.

160.    LMH violated this provision because it never provided written notice to Plaintiffs Dahl, Zachariah, and Moore. It was only because Plaintiffs Dahl and Zachariah affirmatively contacted LMH that LMH divulged any information to Plaintiffs about the Privacy Invasions.

161.    As to Plaintiff Merreighn, LMH violated this provision by failing to detect the Privacy Invasions here for more than two years and then waiting two months after discovery to notify victims of the Privacy Invasions in writing.

162.    The Kansas Health Information Technology Act ("KHITA"), K.S.A. §§ 65-6821–6835, requires healthcare providers like KU Health and LMH to "implement and maintain appropriate administrative technical and physical safeguards to protect the privacy of protected health information in a manner consistent with 45 C.F.R. § 164.530(c)." K.S.A. § 65-6824(b).

163.    As healthcare providers under 45 C.F.R. § 160.102 of the implementing regulations of HIPAA, KU Health and LMH are obligated to comply with all rules and regulations under 45 C.F.R. §§ 160 and 164.

164.    45 C.F.R. § 164 governs "Security and Privacy," with Subpart A providing "General Provisions," Subpart C regulating "Security Standards for the Protection of Electronic Protected Health Information," Subpart D providing requirements for "Notification in the Case of Breach of Unsecured Protected Health Information," and Subpart E governing "Privacy of Individually Identifiable Health Information."

165.    45 C.F.R. § 164.104 states that the "standards, requirements, and implementation specifications adopted under this part" apply to covered entities such as Defendants KU Health and LMH and to their employees, such as KU Health's employee Clinician.

166.    KU Health and LMH violated HIPAA, KDBRA, and KHITA by failing to adhere to and meet the required standards as set forth in several of HIPAA's implementing regulations, including but not limited to 45 C.F.R. §§ 164 Subparts A, C, D, and E.

167.    Defendants are obligated under HIPAA's "Security Rule" to, among other things, "ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits" and "protect against any reasonably anticipated threats or hazards to the security or integrity of such information." 45 C.F.R. § 164.306.

168.    The Security Rule further requires KU Health and LMH to "[i]implement policies and procedures to regularly review records of information system activity, such as audit logs, access reports, and security incident tracking reports"; "[i]mplement policies and procedures to ensure that all members of its workforce have appropriate access to electronic protected health information" and to "prevent those workforce members who do not have" appropriate access "from obtaining access to electronic protected health information"; "[i]mplement procedures to determine that the access of a workforce member to electronic protected health information is appropriate"; and "[i]mplement a security awareness and training program for all members of its workforce," including employees such as Clinician, which program must include "[p]rocedures for monitoring log-in attempts and reporting discrepancies." 45 C.F.R. § 164.308.

169.    HIPAA's "Breach Notification Rule" requires KU Health and LMH to provide timely and sufficient notification of a Privacy Invasions to individuals whose information was compromised in the Privacy Invasions. 45 C.F.R. § 164.404. KU Health violated these requirements by not providing notice to individuals including Plaintiffs and the Class members in a timely fashion and by omitting required content from the notifications. LMH violated this requirement because it gave no written notice whatsoever. The fact that KU Health gave written notice—inadequate as that notice may be—further shows LMH's violation of HIPAA's breach notification rule.

170.    HIPAA's "Privacy Rule" prohibits KU Health and LMH from using or disclosing PHI except for permitted purposes and requires KU Health and LMH to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of" PHI. 45 C.F.R. §§ 164.502, 530. KU Health and LMH violated these requirements by, among other reasons, allowing Clinician to use Plaintiffs' and Class members' PHI for purposes other than treatment, payment, or health care operations, or for any other permissible purpose and by failing to have in place the proper PHI privacy safeguards.

171.    The United States Department of Health and Human Services Office for Civil Rights ("OCR") has published guidance for healthcare providers like KU Health and LMH. In a guidance document titled "Summary of the HIPAA Privacy Rule," OCR states that "[a] covered entity must train all workforce members on its privacy policies and procedures" and that covered entities "must have and apply appropriate sanctions against workforce members who violate its privacy policies and procedures or the Privacy Rule" under HIPAA.[21]

172.    KU Health ignored this regulatory guidance and further violated HIPAA by failing to adequately monitor and train Clinician regarding KU Health's privacy policies and procedures and by failing to apply any sanctions on Clinician for more than two years, before terminating his employment with KU Health.

173.    These many violations, among others, directly resulted in the Privacy Invasions.

***Defendant Epic Failed to Design and Implement a Reasonably Secure EHR Platform or to Implement Reasonable Access Controls or Audit Capabilities***

174.    Epic is a covered entity under HIPAA and is therefore subject to its privacy and security requirements when handling PHI.

---

[21] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/summary/privacysummary.pdf (last visited June 20, 2025).

175.    At all times, Epic has held itself out to its clients and the general public, including to KU Health and the Plaintiffs, as an electronic medical record designer, manufacturer, supplier, and seller, possessing the degree of knowledge, ability, and skill possessed by reasonably competent electronic medical record designers, manufacturers, suppliers, and sellers.

176.    The EHR platform designed, developed, sold, and implemented by Epic and utilized by KU Health should have included industry-standard safeguards to protect patient PII and PHI, including secure sign-on protocols, role-based access controls, application-level authorization, comprehensive audit logging capabilities, and automated reporting and alert functions to identify unauthorized access.

177.    Even in a standard "build and configure" implementation of Epic's EHR system, unauthorized access of the kind engaged in by the Clinician—particularly sustained, repeated access to sensitive records of non-patients—should have been technologically blocked, flagged in real time, or promptly detected. Epic's system failed to prevent or alert to this unauthorized access, enabling it to continue unchecked for over two years.

178.    Epic integrates third-party tools, including Imprivata—a digital identity and access management platform widely used in healthcare settings. Imprivata's FairWarning Patient Privacy Intelligence solution is specifically designed to monitor EHR access logs, detect suspicious or unauthorized behavior, and notify the healthcare organization when such activity occurs. It also detects patterns consistent with EHR "snooping" and other internal threats. Use of such tools is standard practice among health systems, especially in light of the known and growing risk of insider breaches.

179.    Upon information and belief, KU Health's Epic-based EHR system included or was configured to work with Imprivata programs, including its access monitoring and alerting tools. Despite the availability of this technology, KU Health and/or Epic failed to configure or utilize it

in a manner that would have prevented or detected the Clinician's repeated and unauthorized access to non-treating individuals' records.[22]

### *The Impact of the Privacy Invasions on the 425+ Victims*

180.    The Privacy Invasions have caused and continue to cause profound emotional and psychological trauma to Plaintiffs. The severe emotional distress experienced by Plaintiffs includes, but is not limited to, persistent anxiety when visiting healthcare providers or seeking medical treatment due to a loss of trust in the confidentiality of their health information. Their anxiety manifests in physical symptoms, including elevated heart rate, difficulty sleeping, shortness of breath, gastrointestinal distress, muscle tension, and nausea.

181.    Plaintiffs also experience debilitating fear that they are being stalked, tracked, or targeted by Clinician or others who have their PII and PHI. Plaintiffs have never met Clinician and do not know what he looks like but have reason to believe he lives in Lawrence, Kansas, where Plaintiffs still travel to receive healthcare. Plaintiffs have no way of identifying those who possess their PII and PHI and might use it to commit further abhorrent acts against Plaintiffs. Plaintiffs also suffer fear that someone else at KU Health or LMH can and will violate their privacy again in the future, especially considering it took KU Health more than two years to discover Clinician's conduct and that LMH never disclosed his conduct to Plaintiffs at all until they affirmatively reached out. As a result, Plaintiffs feel deeply and irreparably violated, with a lasting sense of exposure and loss of personal security.

182.    Aside from the deep and permanent impact of the Privacy Invasions on Plaintiffs and Class members, Defendants' failure to keep Plaintiffs' and the Class members' PII and PHI secure has severe ramifications that go beyond Clinician's violations of their privacy. Given the

---

[22] https://www.kansashealthsystem.com/intranet/assets/HITS/imprivataID-install-iOS.pdf (last visited June 20, 2025).

sensitive nature of the PII and PHI stolen in the Privacy Invasions—names, date of birth, and Social Security numbers, insurance and billing information, and clinical information—bad actors like Clinician can commit identity theft, financial fraud, and other identity-related fraud against Plaintiffs and Class members now and into the indefinite future. As a result, Plaintiffs and Class members have suffered injury and face an imminent and substantial risk of further injury including identity theft and related cybercrimes due to the Privacy Invasions.

183.     The PII and PHI exposed in the Privacy Invasions is highly coveted and valuable on underground markets as it can be used to commit identity theft and fraud. Malicious actors use PII to, among other things, gain access to consumers' bank accounts, social media, and credit cards. Malicious actors can also use consumers' PII to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government IDs, or create false identities.

184.     Malicious actors often wait months or years to use the PII and PHI obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen PII and PHI, meaning individuals can be the victims of several cybercrimes stemming from a single data breach. It is unknown what Clinician did with Plaintiffs and Class members' PII and PHI or who else may have accessed it.

185.     Plaintiffs and members of the Class have suffered actual damages and will continue to suffer harm as a direct and foreseeable result of Defendants' failure to adequately protect their PII and PHI. These damages include the unconsented disclosure of their PII and PHI, which are valuable commodities in the digital economy; out-of-pocket expenses incurred to prevent, detect, and remediate fraud, identity theft, and other misuse of their data; and uncompensated time spent monitoring accounts and securing their personal information. Plaintiffs and Class members also

face a substantial and ongoing risk of future harm because their PII and PHI remain in Defendants'

possession and is therefore subject to further unauthorized disclosures so long as KU Health and

LMH fail to undertake appropriate and adequate measures to protect their PII and PHI.

## CLASS ACTION ALLEGATIONS

186.    Pursuant to Fed. R. Civ. P. 23(c)(4), Plaintiffs seek certification of the following

nationwide issue class for purposes of determining the issues of Defendants' liability for their

wrongful conduct (the "Liability Class"):

> **All individuals residing in the United States whose PII and/or PHI was compromised in the Privacy Invasions.**

187.    Pursuant to Fed. R. Civ. P. 23(b)(3), Plaintiffs seek certification of the same class

for purposes of seeking statutory damages for KU Health's violations of the Stored

Communications Act, 18 U.S.C. § 2701 (the "Statutory Damages Class").[23]

188.    Specifically excluded from the Classes are KU Health, LMH, Epic, and their

officers and directors; any entity in which KU Health or LMH or Epic has a controlling interest;

any affiliate, legal representative, heir, or assign of KU Health or LMH or Epic; and Clinician and

any legal representative, heir, or assign of Clinician. Also excluded from the Classes are any

federal, state, or local governmental entities, any judicial officer presiding over this action and the

members of their immediate family and judicial staff, and any juror assigned to this action.

189.    **Liability Class: Federal Rule of Civil Procedure 23(c)(4).** It is appropriate for

this action to be brought and maintained as a class action with respect to the particular issues of

Defendants' liability on the claims of Plaintiffs and the Class members because resolution of these

particular common issues would materially advance the disposition of the litigation as a whole.

---

[23] The Liability Class and Statutory Damages Class are collectively referred to as the "Classes." Members of the Classes are collectively referred to as "Class members."

190.    **Ascertainability**. The members of the Classes are readily identifiable and ascertainable. KU Health, LMH, Epic, and/or their affiliates, among others, possess the information to identify and contact the Class members.

191.    **Numerosity.** The members of the Classes are so numerous that joinder of all of them is impracticable. According to KU Health's representations to HHS, the Classes include 425 victims whose PII and PHI were compromised in the Privacy Invasions.

192.    **Typicality.** As to the Classes, Plaintiffs' claims are typical of the claims of the members because all Class members had their PII and PHI compromised in the Privacy Invasions and were harmed as a result.

193.    **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have no known interest antagonistic to those of the Class members, and Plaintiffs' interests are aligned with Class members' interests. Plaintiffs were subject to the same Privacy Invasions as Class members were, suffered similar harms, and face similar threats due to the Privacy Invasions. Plaintiffs have also retained competent counsel with significant experience litigating complex class actions, including data breach and invasion of privacy cases.

194.    **Commonality and Predominance.** There are questions of law and fact common to the Classes such that there is a well-defined community of interest in this litigation. These common questions relating to liability predominate over any questions affecting only individual Class members. The common questions of law and fact include, without limitation:

- Whether KU Health and LMH breached the contracts they formed with Plaintiffs and the Class members;

- Whether KU Health and LMH owe Plaintiffs and the Class members a duty to exercise reasonable care when KU Health and LMH collect and store Plaintiffs' and Class members' PII and PHI;

- Whether KU Health and LMH acted negligently in connection with the monitoring and/or protection of Plaintiffs' and the Class members' PII and PHI;

- Whether KU Health and LMH violated their duties to implement reasonable security systems to protect Plaintiffs' and Class members' PII and PHI;

- Whether KU Health provided timely and adequate notice of the Privacy Invasions to Plaintiffs and Class members;

- Whether LMH violated its duty to provide notice of the Privacy Invasions to Plaintiffs and the Class members;

- Whether Epic breached its contractual duties to KU Health;

- Whether Plaintiffs and Class members are third-party beneficiaries of agreements between Epic and KU Health or related HIEs or QHINs;

- Whether Epic owed Plaintiffs and the Class members a duty to exercise reasonable care in designing, configuring, and implementing an EHR platform for the storage, maintenance, and transmission of Plaintiffs' and Class members' PII and PHI;

- Whether Epic acted negligently in designing, configuring, and implementing its EHR platform for KU Health;

- Whether KU Health violated its duty to adequately train and supervise Clinician;

- Whether KU Health violated its common law duties by retaining Clinician before and during the Privacy Invasions; and

- Whether KU Health is vicariously liable for Clinician's conduct.

195.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy because treatment as a Class will materially advance resolution of the dispute as to Defendants' liability. Class treatment of common questions of law and fact as to the issues of Defendants' liability is superior to multiple individual actions or piecemeal litigation to establish liability. Absent a class action, most if not all Class members would find the cost of litigating their individual claims prohibitively high and would thus have no

effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members and risk inconsistent treatment of claims arising from the same set of facts and occurrences. Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under the applicable rules.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 –
Against KU Health
(On Behalf of Plaintiffs and the Liability Class)**

196.    Plaintiffs and the Liability Class members repeat and reallege every allegation set forth in the preceding paragraphs.

197.    To perpetrate the Privacy Invasions, Clinician intentionally accessed KU Health's computer systems, which constitutes a computer that has moved in or otherwise affects interstate commerce because it houses the PII and PHI of patients from outside the state of Kansas and is a conduit to access the HIEs in which KU Health participates, which provides access to the PII and PHI of patients from outside the state of Kansas.

198.    Clinician accessed KU Health's computer systems with authorization but intentionally exceeded this authorization by using such access to obtain or alter Plaintiffs' and the Liability Class members' PII and PHI, which information was off limits to Clinician.

199.    Clinician's intentional conduct caused loss to Plaintiffs and Liability Class members during a 1-year period aggregating at least $5,000 in value. Such loss includes but is not limited to time, effort, and out-of-pocket expenses associated with addressing the Privacy Invasions; lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Privacy Invasions; out-of-pocket expenses incurred to prevent,

detect, and remediate fraud, identity theft, and other misuse of their data; uncompensated time spent monitoring accounts and securing their personal information; and the loss of rental or use value of Plaintiffs' and Liability Class members' PII and PHI.

200.    Clinician's intentional conduct caused the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of Plaintiffs and the Liability Class members.

201.    Clinician's intentional conduct caused a threat to public safety.

202.    As a result, Clinician violated the CFAA.

203.    Plaintiffs and the Liability Class members suffered damage and loss by reason of Clinician's violation.

204.    Because Clinician acted within the scope of his employment with KU Health when he violated the CFAA, KU Health is vicariously liable for Clinician's conduct. To wit:

    a.    Clinician's wrongful conduct was of the same general nature as his authorized job duties.

    b.    KU Health's employment of Clinician provided the opportunity and the means by which Clinician committed his wrongful acts. At all relevant times, Clinician used the login credentials provided to him by his employer KU Health to access and exfiltrate Plaintiffs' and the Liability Class members' PII and PHI.

    c.    On information and belief, Clinician was performing services for which he had been employed by KU Health when he accessed and exfiltrated Plaintiffs' and the Liability Class members' PII and PHI during the Privacy Invasions. Therefore, Clinician's wrongful acts were intermingled with his authorized job duties.

d.  Alternatively, Clinician's conduct in accessing and exfiltrating Plaintiffs' and the Liability Class members' PII and PHI during the Privacy Invasions was only a slight deviation from his employment with KU Health, and therefore Clinician's conduct was reasonably incidental to his employment with KU Health.

e.  Clinician's conduct was reasonably foreseeable to KU Health due to the nature of Clinician's employment as an employee with access to patient PII and PHI and his duties relating to that employment.

205.    As a result, Plaintiffs and the Liability Class members are entitled to compensatory damages, injunctive relief, and other equitable relief allowed under the CFAA.

## COUNT II
### Violation of Stored Communications Act ("SCA"), 18 U.S.C. § 2701 – Against KU Health
### (On Behalf of Plaintiffs and the Statutory Damages Class)

206.    Plaintiffs and the Statutory Damages Class members repeat and reallege every allegation set forth in the preceding paragraphs.

207.    To perpetrate the Privacy Invasions, Clinician intentionally accessed KU Health's computer systems, which constitute a facility through which an electronic communication service is provided.

208.    KU Health's computer systems, which include the Epic EHR system, are an electronic communication service. On information and belief, KU Health's systems include the Epic Secure Chat feature, through which KU Health personnel such as the Clinician are able to electronically communicate regarding patients and their PII and PHI.  On information and belief, KU Health's systems also include the EpicCare Link feature, which provides electronic access to and transfer of patient PII and PHI across healthcare providers.

209.    KU Health's Epic EHR also provides the means to communicate with other healthcare providers, including LMH Health. For instance, in LMH Health's December 2020 "Year in Review" published on its website, LMH Health touted that it had "[r]eached a major milestone with interoperability implementing the CommonWell/CareQuality Gateway, which allows us to connect to Epic organizations like KU."[24]

210.    Clinician accessed KU Health's computer systems with authorization but intentionally exceeded this authorization by using such access to obtain, alter, or prevent authorized access to Plaintiffs' and the Statutory Damages Class members' PII and PHI, which contain electronic communications. Clinician did so while such communications were in electronic storage.

211.    As a result, Clinician violated the SCA.

212.    Plaintiffs and the Statutory Damages suffered damage and loss by reason of Clinician's violation.

213.    Because Clinician acted within the scope of his employment with KU Health when he violated the SCA, KU Health is vicariously liable for Clinician's conduct. To wit:

a.  Clinician's wrongful conduct was of the same general nature as his authorized job duties.

b.  KU Health's employment of Clinician provided the opportunity and the means by which Clinician committed his wrongful acts. At all relevant times, Clinician used the login credentials provided to him by his employer KU Health to access and exfiltrate Plaintiffs' and the Statutory Damages Class members' PII and PHI.

---

[24] https://www.lmh.org/news/2020-news/2020-a-year-in-review/ (last viewed on June 20, 2025).

c.  On information and belief, Clinician was performing services for which he had been employed by KU Health when he accessed and exfiltrated Plaintiffs' and the Statutory Damages Class members' PII and PHI during the Privacy Invasions. Therefore, Clinician's wrongful acts were intermingled with his authorized job duties.

d.  Alternatively, Clinician's conduct in accessing and exfiltrating Plaintiffs' and the Statutory Damages Class members' PII and PHI during the Privacy Invasions was only a slight deviation from his employment with KU Health, and therefore Clinician's conduct was reasonably incidental to his employment with KU Health.

e.  Clinician's conduct was reasonably foreseeable to KU Health due to the nature of Clinician's employment as an employee with access to patient PII and PHI and his duties relating to that employment.

214.  As a result, Plaintiffs and the Statutory Damages Class members are entitled to $1,000 per violation. *See* 18 U.S.C. § 2707(c).

215.  Because the violations were intentional, Plaintiffs and the Statutory Damages Class members are entitled to punitive damages.

216.  Plaintiffs are further entitled to reasonable costs and attorney fees.

### <u>COUNT III</u>
### Negligence – Against KU Health
### (On Behalf of Plaintiffs and the Liability Class)

217.  Plaintiffs and the Liability Class Members repeat and reallege every allegation set forth in the preceding paragraphs.

218.  KU Health required Plaintiffs and Liability Class members to provide their Confidential PII and PHI as a condition of receiving healthcare and medical services. Defendant

collected and stored the data for purposes of providing medical treatment as well as for commercial gain.

219.    KU Health owed Plaintiffs and the Liability Class members a common law duty to exercise reasonable care in protecting their PII and PHI from unauthorized disclosure or access. Defendant acknowledged this duty in its Notice of Privacy Practices.

220.    KU Health owed Plaintiffs and the Liability Class members a common law duty of care to provide security, consistent with industry standards, to ensure that Defendant's systems and networks adequately protected their PII and PHI.

221.    As a healthcare provider, KU Health had a special relationship with Plaintiffs and the Liability Class members, who entrusted KU Health to adequately protect their PII and PHI.

222.    KU Health's duty to use reasonable care in protecting Plaintiffs' and Liability Class members' PII and PHI arose as a result of the parties' relationship, as well as common law and the KDBRA, KHITA, and HIPAA, as described above, as well as KU Health's own policies and promises regarding data privacy and security.

223.    KU Health breached its duty to Plaintiffs and the Liability Class members in numerous ways, including but not limited to the following: failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the PII and PHI of Plaintiffs and Liability Class members; failing to comply with industry standard data security measures for the healthcare industry leading up to the Privacy Invasions; failing to comply with its own privacy policies and practices; failing to comply with regulations protecting the PII and PHI at issue during the period of the Privacy Invasions; failing to adequately monitor, evaluate, and ensure the security of KU Health's network and systems; failing to recognize in a timely

manner that PII and PHI had been compromised; and failing to timely and adequately disclose the Privacy Invasions to Plaintiffs and the Liability Class members.

224.    KU Health's failure to take proper security measures to protect the sensitive PII and PHI of Plaintiffs and Liability Class members as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access and exfiltration of their PII and PHI.

225.    Plaintiffs and the Liability Class members are part of a foreseeable, discernible group that was at high risk of having their PII and PHI misused or disclosed if not adequately protected by KU Health.

226.    It was also foreseeable that KU Health's failure to provide timely and forthright notice of the Privacy Invasions would result in injury to Plaintiffs and Liability Class members.

227.    KU Health's violations of KDBRA, KHITA, and HIPAA create a presumption of negligence, as each statute was enacted to protect a class of persons of which Plaintiffs and the Liability Class are members against the type of harm that Plaintiffs and the Liability Class suffered as a result of KU Health's violations.

228.    As a direct and proximate result of KU Health's conduct, Plaintiffs and Liability Class members have suffered damages as described herein, including: (i) the loss of rental or use value of their PII and PHI; (ii) the unconsented publication of their PII and PHI; (iii) time, effort, and out-of-pocket expenses associated with addressing the Privacy Invasions; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Privacy Invasions; (v) anxiety, emotional distress, loss of privacy, physical symptoms and other economic and non-economic losses; (vi) the continued risk to their PII and PHI, which remains in KU Health's possession and is subject to further unauthorized disclosures so long as

KU Health fails to undertake appropriate and adequate measures to protect it; (vii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of Plaintiffs' compromised PII and PHI; and (viii) any nominal damages that may be awarded.

**COUNT IV**
**Negligent Training, Supervision, and Retention – Against KU Health**
**(On Behalf of Plaintiffs and the Liability Class)**

229.    Plaintiffs and the Liability Class Members repeat and reallege every allegation set forth in the preceding paragraphs.

230.    As an employer, KU Health has a common law duty to exercise reasonable care in the selecting and retaining its employees.

231.    As an employer, KU Health also has a common law duty to exercise reasonable care in supervising, monitoring, controlling, and training its employees.

232.    KU Health's duty to use reasonable care in selecting, retaining, supervising, monitoring, controlling, and training its employees also arises under the KHITA and HIPAA, as described above, as well as KU Health's own policies and promises regarding data privacy and security.

233.    It was foreseeable to KU Health that an employee could misuse his position and privileges to inappropriately access and obtain the highly sensitive PII and PHI of KU Health's patients and patients of other healthcare provider participants in the HIEs in which KU Health participates, such as LMH.

234.    At a minimum, once the Privacy Invasions began on February 1, 2021, KU Health had reason to know that Clinician had a propensity for impropriety, that he was improperly performing his job duties, and that he was unfit to be an employee of KU Health.

235.    During the more than two-year period of the Privacy Invasions, KU Health had reason to believe that its employment of Clinician would result in an undue risk of harm to its patients and the patients of other healthcare provider participants in the HIEs in which KU Health participates, such as LMH.

236.    KU Health violated its duty by retaining Clinician for more than two years after the Privacy Invasions began.

237.    KU Health violated its duty by failing to adequately monitor, detect, or investigate Clinician's conduct for more than two years after the Privacy Invasions began.

238.    KU Health violated its duty by failing to properly train Clinician regarding data privacy and security and failing to sanction his conduct until the Privacy Invasions had spanned more than two years.

239.    KU Health's violations of KHITA and HIPAA create a presumption of negligence, as the statutes were enacted to protect a class of persons of which Plaintiffs and the Liability Class are members against the type of harm that Plaintiffs and the Liability Class suffered as a result of KU Health's violations.

240.    As a direct and proximate result of KU Health's conduct, the Privacy Invasions were allowed to happen and Plaintiffs have suffered damages as alleged herein.

### COUNT V
**Breach of Express Contract – Against KU Health**
**(On Behalf of Plaintiffs and the Liability Class)**

241.    Plaintiffs and the Liability Class Members repeat and reallege every allegation set forth in the preceding paragraphs.

242.     KU Health disseminated its "Notice of Privacy Practices" to its patients, which constitutes an agreement between KU Health and individuals who provided their PII and PHI to KU Health exchange for healthcare services, including Plaintiffs and Liability Class members.

243.     Plaintiffs and the Liability Class members formed a contract with KU Health and complied with all obligations under such contract when they provided their PII and PHI to KU Health subject to the Notice of Privacy Practices and paid money to KU Health in exchange for healthcare services.

244.     KU Health promised in its Notice of Privacy Practices that "[w]e are required by law to maintain the privacy and security of your protected health information" and that it would "follow the duties and privacy practices described in this Notice," including "let[ting] you know promptly if a breach occurs."[25]

245.     KU Health has also established a "Code of Conduct" that "[e]very employee and independent contractor of the health system, including board members, supervisors, physicians, volunteers, vendors, consultants, agents and other business partners that work for or provide goods and services to our organization (collectively, "health system team members") is expected to follow . . . along with all applicable laws and policies," including "all applicable laws regarding patients' rights."[26]

246.     In its Code of Conduct, KU Health acknowledges that "[t]o deliver quality care, the health system collects health information about our patients, as well as collecting certain demographic, financial and insurance information" and requires that "[d]uring this process, patient

---

[25] https://www.kansashealthsystem.com/-/media/Project/Website/PDFs-for-Download/privacy/Joint-NPP-ENGLISH-030124.pdf?la=en&hash=268D27B9A24F983C5021EC7B20A5A3054F3A5FB0 (last visited June 20, 2025).

[26] https://www.kansashealthsystem.com/-/media/Files/PDF/About-Us/Code_of_Conduct_Update_July_2019.pdf?la=en&hash=DC2A3DA32811894E090A5703494B0E7062848C05 (last visited June 20, 2025).

privacy and confidentiality should be protected at all times."[27] KU Health requires in its Code of Conduct that all health team members, including Clinician, acknowledge, that they will "[a]ccess patient information only as necessary to perform my particular job duties"; "[r]eport any suspected violation or improper use of patient health information"; and "[i]mmediately report PHI that has been lost, stolen or accessed inappropriately."[28]

247.    KU Health, through its employee Clinician, breached the agreement between KU Health and Plaintiffs and the Liability Class members by intentionally perpetrating the Privacy Invasions.

248.    KU Health independently breached its agreement with Plaintiffs and the Liability Class members when KU Health allowed for the Privacy Invasions to take place in a manner that violated its Notice of Privacy Practices and Code of Conduct.

249.    The agreement and KU Health's breach are of such a kind that serious emotional disturbance is particularly likely to—and did—result.

250.    As a direct and proximate result of these Privacy Invasions, Plaintiffs sustained actual losses and damages as alleged herein, including that Plaintiffs did not receive the benefits of the bargains for which they paid KU Health. Plaintiffs alternatively seek an award of nominal damages.

## COUNT VI
### Breach of Contract, Third-Party Beneficiary – Against Epic
### (On Behalf of Plaintiffs and the Liability Class)

251.    Plaintiffs and the Liability Class Members repeat and reallege every allegation set forth in the preceding paragraphs.

---

[27] *Id.*
[28] *Id.*

252.    One or more contracts exist between Epic and KU Health regarding the EHR platform and solutions Epic designed, built, and implemented for KU Health and as to which Epic continues to provide support to KU Health.

253.    Plaintiffs and the Liability Class are not in possession of these contracts, which are in the exclusive possession of Defendants Epic and KU Health, and Plaintiffs thus make the following allegations on information and belief.

254.    One of the primary purposes, if not the primary purpose, of the contract(s) is to ensure protection of the confidentiality of the patient PII and PHI in the EHR system.

255.    The contract(s) set forth in detail the parameters for the protection or patient PII and PHI, including reference to federal and state law, regulations, and industry standards.

256.    Language used in the contracts clearly expresses the obligation owed by Epic to protect and safeguard the confidentiality of, inter alia, Plaintiffs' and the Liability Class members' PII and PHI within the EHR platform it designed, built, and implemented for KU Health, and which it continues to support and maintain.

257.    Plaintiffs and the Liability Class members are the intended beneficiaries of the agreements between Epic and KU Health related to confidentiality, standards, parameters, and protocols for protection of the PII and PHI housed by the Epic system built for KU Health.

258.    Epic breached its contractual duties by failing to provide a solution that meets the standards and requirements for protection of PII and PHI that are set forth in the contract(s).

259.    Epic breached its contractual duties by failing to provide a solution contemplated by the contract(s) to protect the subject PII and PHI from known and foreseeable threats to its confidentiality.

260.    Epic breached its contractual duties by failing to implement updates or upgrades responsive to known and foreseeable threats as required by its contract(s).

261.    Epic breached its contractual duties by failing to implement updates or upgrades consistent with state and federal law, regulatory guidance, and/or industry standards including CDA, FHIR, and HL7 standards, as referenced and incorporated in its contract(s).

262.    The contract(s) and Epic's breach are of such a kind that serious emotional disturbance is particularly likely to—and did—result.

263.    As a direct and proximate result of these Privacy Invasions, Plaintiffs sustained actual losses and damages as alleged herein, including that Plaintiffs did not receive the benefits of the bargains intended under the contract(s). Plaintiffs alternatively seek an award of nominal damages.

## COUNT VII
### Negligence – Against Epic
### (On Behalf of Plaintiffs and the Liability Class)

264.    Plaintiffs and the Liability Class Members repeat and reallege every allegation set forth in the preceding paragraphs.

265.    Epic owed Plaintiffs and the Liability Class members a duty to exercise reasonable care in designing, configuring, building, implementing, upgrading and maintaining an EHR platform for the storage, maintenance, and transmission of Plaintiffs' PII and PHI.

266.    Epic acted negligently in designing, configuring, and implementing its EHR platform for KU Health.

267.    Among other things, Epic negligently failed to design, develop, configure, implement, activate, update, upgrade or otherwise include industry-standard functions to protect the privacy of and monitor access to the patient PHI and PII within KU's interoperable EHR

system, including sign-on protocols, application authorization, audit capabilities, and reporting functions.

268.    Among other things, Epic negligently failed to design, develop, configure, implement, activate, update, upgrade or otherwise include industry-standard functions to alert and report patterns of snooping behavior and improper access to patient files by credentialed users.

269.    Among other things, Epic failed to design, build, implement, update, and maintain its EHR platform in such a manner that it would warn, alert, or report improper access to any KU Health system administrator, information technology, privacy officer or other oversight body within the KU system.

270.    Epic's failures are unreasonable, are in violation of applicable standards of care in the industry, and constitute negligence.

271.    Epic's failures resulted in repeated, prolonged, improper, and unauthorized access to Plaintiffs' and the Liability Class members PII and PHI, and has caused Plaintiffs and the Liability Class members harm.

272.    Epic's negligence is of such a kind that serious emotional disturbance is particularly likely to—and did—result.

273.    As a direct and proximate result of Epic's negligence, Plaintiffs sustained actual losses and damages as alleged herein.

274.    In addition to these damages, Plaintiffs have suffered severe emotional, psychological and other injury, including physical injury as a result of Epic's negligent failure to protect the confidentiality of their PHI and PII, including symptoms typical of Post-Traumatic Stress Syndrome ("PTSD") such as racing heart, nausea, vomiting, sweating, shortness of breath, fluctuations in blood pressure, headaches, and pain.

275.    As a direct and proximate result of the negligent actions and inactions of Defendant Epic, Plaintiffs have suffered physical injuries, PTSD, and severe emotional distress, and these injuries continue.

276.    Plaintiffs seek damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

**COUNT VIII**
**Breach of Express Contract – Against LMH**
**(On Behalf of Plaintiffs and the Liability Class)**

277.    Plaintiffs and the Liability Class Members repeat and reallege every allegation set forth in the preceding paragraphs.

278.    LMH disseminated its "Notice of Privacy Practices" to its patients, which constitutes an agreement between LMH and individuals who provided their PII and PHI to LMH in exchange for healthcare services, including Plaintiffs and Liability Class members.

279.    Plaintiffs and the Liability Class members formed a contract with LMH and complied with all obligations under such contract when they provided their PII and PHI to LMH subject to the Notice of Privacy Practices and paid money to LMH in exchange for healthcare services and treatment from LMH

280.    LMH promised in its Notice of Privacy Practices to "[m]ake sure that medical information that identifies you is kept private; [m]ake available to you, this notice of our legal duties and privacy practices with respect to medical information about you; [f]ollow the terms of the notice that is currently in effect," and "to notify you by first class mail or by e-mail . . . of any breach of your unsecured protected health information."[29]

---

[29] https://www.lmh.org/app/files/public/e54a9a3b-6cff-43cb-8f1e-5230943f3f3a/npp20190610-en.pdf (last visited June 20, 2025).

281.    LMH has also established a "Code of Conduct," which is "mandatory and must be followed."[30]

282.    LMH states in its Code of Conduct that "LMH Health associates must never access, use, or disclose confidential information that violates the privacy rights of our patients" and that "[u]nder our privacy and security policies and procedures, which reflect HIPAA requirements, no LMH Health associate, member of the medical staff, or other healthcare partner has a right to access, use, or disclose any patient information other than what which is necessary to perform his or her job," promising that "patients can expect their privacy will be protected and patient information will be released only to persons authorized by law or by the patient's written authorization."[31]

283.    LMH breached its agreement with Plaintiffs and the Liability Class members when LMH allowed for the Privacy Invasions to take place in a manner that violated LMH's Notice of Privacy Practices and Code of Conduct.

284.    The agreement and LMH's breach are of such a kind that serious emotional disturbance is particularly likely to—and did—result.

285.    As a direct and proximate result of these Privacy Invasions, Plaintiffs sustained actual losses and damages as alleged herein, including that Plaintiffs did not receive the benefits of the bargains for which they paid LMH. Plaintiffs alternatively seek an award of nominal damages.

---

[30] https://www.lmh.org/app/files/public/56a15b27-e508-485a-aae4-edd3a6158329/Code%20of%20Conduct.pdf (June 20, 2025).
[31] *Id.*

## COUNT IX
### Breach of Implied Contract – Against KU Health and LMH
### (On Behalf of Plaintiffs and the Liability Class)

286.    Plaintiffs and the Liability Class Members repeat and reallege every allegation set forth in the preceding paragraphs.

287.    Plaintiffs and the Liability Class members paid and provided their PII and PHI to KU Health and LMH in exchange for healthcare services and treatment from KU Health and LMH.

288.    As part of these transactions, KU Health and LMH agreed to safeguard and protect the PII and PHI of Plaintiffs and Liability Class members. Implicit in these transactions between KU Health, LMH, Plaintiffs, and Liability Class members was the obligation that KU Health and LMH would use the PII and PHI for approved business purposes only and would not make unauthorized disclosures of the information or allow unauthorized or improper access to or exfiltration of the information.

289.    KU Health and LMH implicitly promised to retain this PII and PHI only under conditions that kept such information private, secure, and confidential and therefore had a duty to reasonably safeguard and protect the PII and PHI of Plaintiffs and Liability Class members from unauthorized or improper access, disclosure, or exfiltration.

290.    Plaintiffs and the Liability Class members entered into implied contracts with the reasonable expectation that KU Health's and LMH's data security practices and policies were reasonable and consistent with industry standards. Plaintiffs and Liability Class members believed that KU Health and LMH would use part of the monies paid to KU Health and LMH under the implied contracts to fund adequate and reasonable data security practices to protect their PII and PHI.

291.    Plaintiffs and the Liability Class members would not have provided and entrusted their PII and PHI to KU Health and LMH or would have paid less for KU Health's or LMH's services in the absence of the implied contract between them and KU Health and LMH. The safeguarding of Plaintiffs' and Liability Class members' PII and PHI was critical to realizing the intent of the parties.

292.    The nature of KU Health's and LMH's implied promise was to protect Plaintiffs' and Liability Class members' PII and PHI in order to prevent harm.

293.    As a KU Health employee, Clinician breached the implied contract between KU Health and Plaintiffs and the Liability Class members by intentionally perpetrating the Privacy Invasions.

294.    KU Health and LMH breached their implied contracts with Plaintiffs and the Liability Class members by failing to reasonably safeguard and protect their PII and PHI, which was compromised as a result of the Privacy Invasions.

295.    As a direct and proximate result of KU Health's and LMH's Privacy Invasions, Plaintiffs and the Liability Class members sustained actual losses and damages as alleged herein, including that they did not receive the benefits of the bargains for which they paid. Plaintiffs and Liability Class members alternatively seek an award of nominal damages.

## COUNT X
**Invasion of Privacy, Intrusion Upon Seclusion – Against KU Health**
**(On Behalf of Plaintiffs and the Liability Class)**

296.    Plaintiffs and the Liability Class Members repeat and reallege every allegation set forth in the preceding paragraphs.

297.    Plaintiffs and the Liability Class members shared PII and PHI with KU Health that they wanted to remain private and non-public.

298.     Plaintiffs and the Liability Class members reasonably expected that the PII and PHI they shared with KU Health would be protected and secured from unauthorized disclosure or exfiltration and would not be accessed, disclosed, or obtained for any improper purpose.

299.     By accessing and obtaining Plaintiffs' and Liability Class members' PII and PHI without a proper purpose for doing so, Clinician intentionally intruded into Plaintiffs' and Liability Class members' seclusion.

300.     The PII and PHI that was compromised in the Privacy Invasions was highly sensitive, private, and confidential, as it included Social Security numbers, clinical photographs, body measurements, and other information that is the type of sensitive, personal information that one normally expects will be protected from exposure by the entity charged with safeguarding it.

301.     Clinician's intrusions into Plaintiffs' and the Liability Class members' seclusion were substantial and would be highly offensive to a reasonable person, amounting to an egregious breach of social norms.

302.     Clinician's intrusion upon Plaintiffs' and the Liability Class members' seclusion was willful and wanton. It was willful because it was intentional conduct. It was wanton because Clinician displayed a mental attitude of complete disregard for the rights of others and the consequences of his actions. Clinician acted with no concern for the privacy or rights of Plaintiffs and the Liability Class members that he was violating, and he knew or should have known that what he was doing was a crime, let alone a fireable offense. But he perpetrated the Privacy Invasions anyway, for more than two years.

303.     Because Clinician acted within the scope of his employment with KU Health when he intentionally intruded into Plaintiffs' and the Liability Class members' seclusion, KU Health is vicariously liable for Clinician's conduct. To wit:

a.  Clinician's tortious conduct was of the same general nature as his authorized job duties.

b.  KU Health's employment of Clinician provided him the opportunity and the means by which to commit his tortious acts. At all relevant times, Clinician used the login credentials and digital infrastructure provided to him by his employer KU Health to access and exfiltrate Plaintiffs' and the Liability Class members' PII and PHI.

c.  On information and belief, Clinician was performing services for which he had been employed by KU Health when he accessed and exfiltrated Plaintiffs' and the Liability Class members' PII and PHI during the Privacy Invasions. Therefore, Clinician's tortious acts were intermingled with his authorized job duties.

d.  Alternatively, Clinician's conduct in accessing and exfiltrating Plaintiffs' and Liability Class members' PII and PHI during the Privacy Invasions was only a slight deviation from Clinician's employment duties with KU Health, and therefore his conduct was reasonably incidental to his employment with KU Health.

e.  Clinician's conduct was reasonably foreseeable to KU Health due to the nature of Clinician's employment as an employee with access to patients' PII and PHI and his duties relating to that employment.

304.  Alternatively, KU Health is vicariously liable for Clinician's wrongful acts even if not committed within the scope of his employment because KU Health aided and abetted Clinician's intentional intrusion upon Plaintiffs' and the Liability Class members' seclusion. To wit:

a.  Clinician performed a tortious act that caused injury to Plaintiffs and the Liability Class when he intentionally intruded upon their seclusion.

54

b.  KU Health was generally aware of its role as part of tortious activity at the time KU Health assisted Clinician.

c.  KU Health knowingly and substantially assisted Clinician's tortious conduct by providing him access to the PII and PHI of Plaintiffs and the Liability Class members and allowing Clinician to maintain that access during the period of the Privacy Invasions, during which KU Health knew or should have known that Clinician was inappropriately accessing and exfiltrating their PII and PHI.

d.  Clinician performed his tortious conduct by virtue of his employer-provided access to patients' PII and PHI. Clinician would not have been able to access or exfiltrate their PII and PHI but for his employer KU Health having provided him the means to do so throughout the duration of the Privacy Invasions.

e.  KU Health was Clinician's employer during the entire period of the Privacy Invasions. KU Health assisted Clinician by providing him the means of accessing and exfiltrating Plaintiffs' and Liability Class members' PII and PHI throughout the duration of his employment at KU Health, including the entire time of the Privacy Invasions.

f.  KU Health knew Clinician would use and was using the access it provided to Clinician to access patients' PII and PHI, both at KU Health and at other healthcare providers that participated in the HIEs in which KU Health participated.

g.  Because Clinician was KU Health's employee throughout the Privacy Invasions, and because Clinician committed the wrongful conduct on KU Health's systems with access provided by KU Health, KU Health was present during the entire period of the Privacy Invasions.

305.    Alternatively, KU Health is vicariously liable for Clinician's wrongful acts even if not committed within the scope of his employment and even if KU Health's conduct did not rise to the level of knowingly aiding and abetting Clinician because KU Health substantially assisted Clinician in his intentional intrusion upon Plaintiffs' and the Liability Class members' seclusion and because that substantial assistance amounts to a breach of duty owed by KU Health to Plaintiffs and the Liability Class members. To wit:

a.    KU Health substantially assisted Clinician's tortious conduct by providing him the means to access and exfiltrate the PII and PHI of Plaintiffs and the Liability Class members and allowing Clinician to maintain those means during the period of the Privacy Invasions.

b.    Clinician performed his tortious conduct by virtue of his employer-provided access to patients' PII and PHI. Clinician would not have been able to access their PII and PHI but for his employer KU Health having provided him the means to do so throughout the duration of the Privacy Invasions.

c.    KU Health was Clinician's employer during the entire period of the Privacy Invasions. KU Health assisted Clinician by providing him the means to access and exfiltrate Plaintiffs' and Liability Class members' PII and PHI throughout the duration of his employment at KU Health, including the entire time of the Privacy Invasions.

d.    KU Health's own conduct, separately considered, constitutes a breach of duty that KU Health owed to Plaintiffs and the Liability Class members.

e.    By substantially assisting Clinician, KU Health breached its duties to Plaintiffs and the Liability Class members in at least the following ways: KU Health failed to

exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the PII and PHI of Plaintiffs and Liability Class members; failed to comply with industry standard data security measures for the healthcare industry leading up to the Privacy Invasions; failed to comply with its own privacy policies and practices; failed to comply with regulations protecting the PII and PHI at issue during the period of the Privacy Invasions; failed to adequately monitor, evaluate, and ensure the security of KU Health's network and systems; failed to recognize in a timely manner that Plaintiffs' and Liability Class members' PII and PHI had been compromised; retaining Clinician for more than two years after the Privacy Invasions began; failing to detect Clinician's conduct for more than two  years after the Privacy Invasions began; and failed to adequately train Clinician regarding data privacy and security.

306.    As a direct and proximate result of Defendants' invasion of privacy, Plaintiffs and the Liability Class suffered injury and sustained actual losses and damages as alleged herein. Plaintiffs alternatively seek an award of nominal damages.

## <u>COUNT XI</u>
### Intentional Infliction of Emotional Distress – Against KU Health
### (On Behalf of Plaintiffs and the Liability Class)

307.    Plaintiffs and the Liability Class Members repeat and reallege every allegation set forth in the preceding paragraphs.

308.    Clinician intentionally accessed and obtained the highly sensitive PII and PHI of Plaintiffs and the Liability Class members, including Plaintiffs'  clinical photographs and body measurements.

309.    For someone in Clinician's position to do what Clinician did is extreme and outrageous.

310.    Plaintiffs have experienced extreme and severe mental distress, as discussed earlier.

311.    Clinician's intentional conduct in accessing and obtaining Plaintiffs' PII and PHI directly caused them mental distress.

312.    Clinician's intentional infliction of emotional distress upon Plaintiffs and Liability Class members was willful because it was intentional conduct and wanton because Clinician displayed a mental attitude of complete disregard for the rights of others and the consequences of his actions. Clinician acted with no concern for Plaintiffs and the Liability Class members, and he knew or should have known that what he was doing was a crime, let alone a fireable offense. But he perpetrated the Privacy Invasions anyway, for more than two years.

313.    Because Clinician acted within the scope of his employment with KU Health when he intentionally inflicted emotional distress on Plaintiffs, KU Health is vicariously liable for Clinician's conduct. To wit:

    a.    Clinician's wrongful conduct was of the same general nature as his authorized job duties.

    b.    KU Health's employment of Clinician provided him the opportunity and the means by which to commit his wrongful acts. At all relevant times, Clinician used the login credentials provided to him by his employer KU Health to access Plaintiffs' and Liability Class members' PII and PHI.

    c.    On information and belief, Clinician was performing services for which he had been employed by KU Health when he accessed their PII and PHI during the Privacy

Invasions. Therefore, Clinician's wrongful acts were intermingled with his authorized job duties.

d. Alternatively, Clinician's conduct in accessing their PII and PHI during the Privacy Invasions was only a slight deviation from Clinician's employment with KU Health, and therefore his conduct was reasonably incidental to his employment with KU Health.

e. Clinician's conduct was reasonably foreseeable to KU Health due to the nature of Clinician's employment and his duties relating to that employment.

314. Alternatively, KU Health is vicariously liable for Clinician's wrongful acts even if not committed within the scope of his employment because KU Health aided and abetted Clinician's intentional infliction of emotional distress on Plaintiffs and the Liability Class members. To wit:

a. Clinician performed a wrongful act that caused injury to Plaintiffs and the Liability Class when he intentionally inflicted emotional distress on them.

b. KU Health was generally aware of its role as part of tortious activity at the time KU Health assisted Clinician.

c. KU Health knowingly and substantially assisted Clinician's tortious conduct by providing him access to the PII and PHI of Plaintiffs and the Liability Class members and allowing Clinician to maintain that access during the period of the Privacy Invasions, during which KU Health knew or should have known that Clinician was inappropriately accessing their PII and PHI.

d. Clinician performed his wrongful conduct by virtue of his employer-provided access to patients' PII and PHI. Clinician would not have been able to access their

PII and PHI but for his employer KU Health having provided him the means to do so throughout the duration of the Privacy Invasions.

e.  KU Health was Clinician's employer during the entire period of the Privacy Invasions. KU Health assisted Clinician by providing him the means of access to Plaintiffs' and Liability Class members' PII and PHI throughout the duration of his employment at KU Health, including the entire time of the Privacy Invasions.

f.  KU Health knew Clinician would use and was using the access it provided to Clinician to access patients' PII and PHI, both at KU Health and at other healthcare providers that participated in the HIEs in which KU Health participated.

g.  Because Clinician was KU Health's employee throughout the Privacy Invasions, and because Clinician committed the wrongful conduct on KU Health's systems, KU Health was present during the entire period of the Privacy Invasions.

315.  Alternatively, KU Health is vicariously liable for Clinician's wrongful acts even if not committed within the scope of his employment and even if KU Health's conduct did not rise to the level of knowingly aiding and abetting Clinician because KU Health substantially assisted Clinician in his intentional infliction of emotional distress on Plaintiffs and the Liability Class members and that substantial assistance amounts to a breach of duty owed by KU Health to Plaintiffs and the Liability Class members. To wit:

a.  KU Health substantially assisted Clinician's tortious conduct by providing him access to the PII and PHI of Plaintiffs and the Liability Class members and allowing Clinician to maintain that access during the period of the Privacy Invasions.

b.  Clinician performed his wrongful conduct by virtue of his employer-provided access to patients' PII and PHI. Clinician would not have been able to access their

PII and PHI but for his employer KU Health having provided him the means to do so throughout the duration of the Privacy Invasions.

c.  KU Health was Clinician's employer during the entire period of the Privacy Invasions. KU Health assisted Clinician by providing him the means of access to Plaintiffs' and Liability Class members' PII and PHI throughout the duration of his employment at KU Health, including the entire time of the Privacy Invasions.

d.  KU Health's own conduct, separately considered, constitutes a breach of duty that KU Health owed to Plaintiffs and the Liability Class members. By substantially assisting Clinician, KU Health failed to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the PII and PHI of Plaintiffs and Liability Class members; failed to comply with industry standard data security measures for the healthcare industry leading up to the Privacy Invasions; failed to comply with its own privacy policies and practices; failed to comply with regulations protecting the PII and PHI at issue during the period of the Privacy Invasions; failed to adequately monitor, evaluate, and ensure the security of KU Health's network and systems; failed to recognize in a timely manner that Plaintiffs' and Liability Class members PII and PHI had been compromised; retaining Clinician for more than two years after the Privacy Invasions began; failing to detect Clinician's conduct for more than two years after the Privacy Invasions began; and failed to adequately train Clinician regarding data privacy and security.

316.    As a direct and proximate result of Defendants' intentional infliction of emotional distress, Plaintiffs suffered injury and sustained actual losses and damages as alleged herein. Plaintiffs alternatively seek an award of nominal damages.

### COUNT XII
**Violation of Freedom from Unreasonable Search and Seizure under the Fourth Amendment and Right to Informational Privacy under the Fourteenth Amendment to the United States Constitution, brought pursuant to 42 U.S.C. § 1983 – Against KU Health (On Behalf of Plaintiffs and the Liability Class)**

317.    Plaintiffs and the Liability Class members repeat and reallege every allegation set forth in the preceding paragraphs.

318.    KU Health is established and authorized to provide healthcare by Kansas statute, and thus KU Health and its employees act under color of state law for § 1983 purposes.

319.    Plaintiffs' and the Liability Class members' PII and PHI are their papers and effects under the Fourth Amendment and highly private and confidential under the Fourteenth Amendment.

320.    Plaintiffs and the Liability Class members had a legitimate and reasonable expectation that their PII and PHI would remain private and confidential while in KU Health's possession due to the highly sensitive and personal nature of their PII and PHI, which includes medical information such as photographs and body measurements.

321.    As KU Health's employee, Clinician acted under color of state law when he perpetrated the Privacy Invasions, in which he accessed and exfiltrated Plaintiffs' and the Liability Class members' highly sensitive PII and PHI. Clinician's search and seizure of their PII and PHI was unreasonable: he exceeded the access KU Health authorized him to have, and there was no appropriate purpose for his access or exfiltration of the PII and PHI.

322.     In so doing, Clinician and KU Health violated Plaintiffs' and the Liability Class members' freedom from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution.

323.     In doing so, Clinician and KU Health also violated Plaintiffs' and the Liability Class members' right to informational privacy under the Fourteenth Amendment.

324.     Neither Clinician nor KU Health advanced a compelling state interest by their wrongful conduct.

325.     KU Health's violations of Plaintiffs' and Liability Class members' Constitutional rights are ongoing. On information and belief, Clinician continues to possess the PII and PHI of Plaintiffs and the Liability Class members, and thereby continues to unreasonably search and seize their papers and effects and to unreasonably intrude into their informational privacy.

326.     As a direct and proximate result of KU Health's and Clinician's violations of Plaintiffs' and the Liability Class members' federal Constitutional rights, Plaintiffs and the Liability Class members have suffered damages as alleged herein.

## COUNT XIII
**Violation of Right to Informational Privacy under the Fourteenth Amendment to the
United States Constitution, brought pursuant to 42 U.S.C. § 1983 – Against LMH
(On Behalf of Plaintiffs and the Liability Class)**

327.     Plaintiffs and the Liability Class members repeat and reallege every allegation set forth in the preceding paragraphs.

328.     LMH is a municipal governmental entity established under Kansas statute, and thus LMH is a person acting under color of state law for § 1983 purposes.

329.     Plaintiffs' and the Liability Class members' PII and PHI are highly private and confidential under the Fourteenth Amendment.

330. Plaintiffs and the Liability Class members had a legitimate and reasonable expectation that their PII and PHI would remain private and confidential while in LMH's possession due to the highly sensitive and personal nature of their PII and PHI, which includes medical information such as photographs and body measurements.

331. LMH has a widespread, well-settled practice of allowing other healthcare providers to access the PII and PHI of LMH's patients, free of scrutiny and without verifying whether such providers are authorized to do so or whether such access is appropriate. This practice is a standard operating procedure of LMH.

332. In the alternative, LMH could have, but did not, establish a policy of monitoring other healthcare providers' access to LMH's patients' PII and PHI and verifying that such access was authorized or for an appropriate purpose. LMH's failure to do so amounts to deliberate indifference to the Constitutional rights of Plaintiffs and the Liability Class members.

333. As a direct and proximate result of LMH's official policy or custom, or, alternatively, its deliberately indifferent failure to establish a policy described in the previous paragraph, Clinician was able to access and exfiltrate the PII and PHI of LMH's patients unchecked for the more than two-year period of the Privacy Invasions.

334. LMH's official policy or custom or deliberately indifferent failure was the moving force behind the violations of Plaintiffs' and the Liability Class members' Constitutional right to informational privacy.

335. As a direct and proximate result of LMH's violations of Plaintiffs' and the Liability Class members' federal Constitutional rights, Plaintiffs and the Liability Class have suffered damages as alleged herein.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes set forth herein, respectfully requests the following relief:

        A.     That the Court certify this action as a class action on particular issues relating to Defendants' liability and to seek damages on behalf of the Statutory Damages Class and appoint Plaintiffs and their Counsel to represent the Classes;

        B.     That the Court grant permanent, prospective injunctive relief to prohibit and prevent KU Health, LMH, and Epic from continuing to engage in unlawful acts, omissions, and practices described herein;

        C.     That the Court award Plaintiffs compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

        D.     That the Court award punitive damages to Plaintiffs;

        E.     That the Court award statutory damages under 18 U.S.C. § 2707(c) to Plaintiffs and the Statutory Damages Class;

        F.     That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorney's fees, costs, and expenses; and

        G.     That the Court award to Plaintiffs pre-judgment and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, individually and on behalf of the proposed Classes, demand a trial by jury on all issues so triable.

## DESIGNATION OF PLACE OF TRIAL

Pursuant to Local Rule 40.2, Plaintiffs hereby requests Kansas City, Kansas, as the place for trial.


Dated: June 23, 2025                    Respectfully submitted,


*/s/ J. Austin Moore*
J. Austin Moore (D. Kan. No. 78557)
Larkin E. Walsh, #21855
Benjamin J. Stueve, #28515
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101
moore@stuevesiegel.com
walsh@stuevesiegel.com
ben.stueve@stuevesiegel.com

66